454 Mass. 337 (2009) 337

Boston Gas Company *v.* Century Indemnity Company; Certain Underwriters at Lloyd's London.

Boston Gas Company[1] *vs.* Century Indemnity Company; Certain Underwriters at Lloyd's London & others,[2] third-party defendants.

Suffolk. January 8, 2009. - July 24, 2009.

Present: Marshall, C.J., Ireland, Spina, Cowin, Cordy, & Botsford, JJ.

*Insurance,* Comprehensive liability insurance, Coverage, Construction of policy. *Contract,* Insurance, Indemnity, Construction of contract. *Environment,* Environmental cleanup costs. *Words,* "Joint and several," "Ultimate net loss," "Occurrence," "Pro rata allocation."

Where an insured protected by standard commercial general liability policy language incurs covered costs as a result of ongoing environmental contamination occurring over more than one year and the insurer against whom suit is brought provided coverage for less than the full period of years in which contamination occurred, the direct liability of the sued insurer should be allocated on a pro rata basis [347-366] by the time-on-the-risk method, in the absence of evidence more closely approximating the actual distribution of property damage, with the policyholder responsible for any periods that it went without insurance and, unless the policy language unambiguously provides otherwise, liable for its per occurrence self-insured retention prorated on the same basis as the insurer's liability [367-373].

Certification of questions of law to the Supreme Judicial Court by the United States Court of Appeals for the First Circuit.

*Guy A. Cellucci,* of Pennsylvania (*Shane R. Heskin* with him) for the defendant.

*David L. Elkind,* of the District of Columbia (*Ronald Macklin,* of New York, with him) for the plaintiff.

*Jo-Ann Horn Maynard,* of Washington, for the third-party defendants.

The following submitted briefs for amici curiae:

*Eugene R. Anderson, William G. Passannante, & Carrie*

[1]Doing business as Keyspan Energy Delivery.

[2]Certain London Market Insurance Companies; Travelers Casualty and Surety Company Associated Electric & Gas Insurance Services Limited; Aetna Casualty & Surety Company; The Hartford Insurance Company.

*Maylor,* of New York, & *Amy Bach,* of California, for United Policyholders.

*Richard Neumeier* for Continental Casualty Company.

*Martin F. Gaynor, III,* & *Nicholas D. Stellakis* for A.W. Chesterton Company.

*William F. Greaney, Deanna M. Wilcox,* & *Gregory M. Lipper,* of the District of Columbia, & *Francis J. Sally* & *Andrea Peraner-Sweet* for The Gillette Company.

*Peter G. Hermes, Kevin J. O'Connor,* & *Michael S. Batson* for OneBeacon America Insurance Company.

*Laura A. Foggan, Paul A. Dame,* & *Parker J. Lavin,* of the District of Columbia, & *Richard Riley* & *William P. Mekrut* for The American Insurance Association & others.

CORDY, J. In connection with an appeal pending before it, the United States Court of Appeals for the First Circuit has certified the following questions to this court, pursuant to S.J.C. Rule 1:03, as appearing in 382 Mass. 700 (1981):

> "1. Where an insured protected by standard CGL[3] policy language incurs covered costs as a result of ongoing environmental contamination occurring over more than one year and the insurer provided coverage for less than the full period of years in which contamination occurred, should the direct liability of the sued insurer be pro rated in some manner among all insurers 'on the risk,' limiting the direct liability of the sued insurer to its share but leaving the insured free to seek the balance from other such insurers?

> "2. If some form of pro rata liability is called for in such circumstances, what allocation method or formula should be used?

> "3. If a single insurer in such circumstances is subject to

---

[3]The acronym "CGL," which prior to 1986 stood for "comprehensive general liability," now stands for "commercial general liability." See 9A G. Couch, § 129:1, at 129-5 (3d ed. 2005). The policies at issue in this case, which were written long before 1986, are "comprehensive" general liability policies. We shall use the acronym, "CGL," to refer to the policies at issue here. "[CGL] policies are designed to protect the insured against losses to third parties arising out of the operation of the insured's business." *Id.* at § 129:2, at 129-7.

454 Mass. 337 (2009) 339

Boston Gas Company *v.* Century Indemnity Company; Certain Underwriters at Lloyd's London.

liability under more than one policy and each policy has a separate deductible or self-insured retention, should the insured be able to collect covered losses from a single policy subject only to that policy's deductible or self-insured retention, or should liability be reduced by the sum of the applicable self-insured retentions, effectively allocating total liability across the policies of that insurer in effect during the contamination period?"

*Boston Gas Co.* v. *Century Indem. Co.*, 529 F.3d 8, 24 (1st Cir. 2008).

We answer the certified questions as follows with respect to the policies at issue. As to the first certified question, we respond that liability should be prorated. As to the second certified question, we respond by adopting the time-on-the-risk method of prorating liability in the absence of evidence more closely approximating the actual distribution of property damage. Our answers to the first two certified questions obviate the need to answer the third certified question.[4]

*Facts.* We summarize the background facts and procedural history set forth in the opinion accompanying the certification order, *id.* at 10-23, supplemented by additional undisputed facts from the record.

1. *Background.* Boston Gas Company (Boston Gas) is the largest provider of natural gas in the New England area. Before natural gas became New England's primary energy source, Boston Gas produced gas fuel at facilities called manufactured gas plants (MGPs). The MGPs created gas by heating coal in large ovens, generating gas that was then purified and piped out for use. This process produced a variety of byproducts, including ash, drip oil, tar, and coke. Many of these byproducts are nonbiodegradable and some are deemed carcinogenic. These byproducts now contaminate the ground and water around many former MGP sites.

---

[4]We acknowledge the amicus briefs of the American Insurance Association, Complex Insurance Claims Litigation Association, the National Association of Mutual Insurance Companies, and the Property Casualty Insurers Association of America; A.W. Chesterton Company; Certain Underwriters at Lloyd's London and Certain London Market Insurance Companies; Continental Casualty Company; The Gillette Company; OneBeacon America Insurance Company; and United Policyholders.

Contamination has been discovered at twenty-nine former Boston Gas MGPs. This case concerns only one of those sites, located in Everett.

Boston Gas operated the Everett MGP from 1908 until about 1969. The Everett MGP produced manufactured gas and processed coke oven gas purchased from a nearby coke plant. In 1995, a routine investigation uncovered contamination at the Everett site. The primary contaminant in this case was tar, which is the main liquid byproduct of manufactured gas production.[5] Although the site had been sold to a new owner (DOMAC, LLC) in 1970, Boston Gas was strictly liable under Massachusetts law for all costs associated with the investigation and cleanup of the contamination caused by the Everett MGP's operations.[6]

2. *The Century policies.* Boston Gas purchased CGL insurance policies from several different insurers during its operation of the Everett MGP. During the period from December 1, 1951, through December 1, 1969, three different first-layer excess CGL policies were issued by Century Indemnity Company (Century) to Boston Gas which provided coverage for, among other things, operations at the Everett MGP.[7] The policies were

---

[5]At nearly all the manufactured gas plant (MGP) sites, some tar escaped confinement and leaked into the environment. Once that leakage happens, tar tends to migrate and to contaminate soils and groundwater beyond the borders of the facility's site.

[6]Boston Gas's investigation and cleanup were performed pursuant to the Massachusetts Oil and Hazardous Material Release Prevention Act, see G. L. c. 21E, and the orders and directives of the Massachusetts Department of Environmental Protection.

[7]"Primary insurance" is "[i]nsurance that attaches immediately on the happening of a loss; insurance that is not contingent on the exhaustion of an underlying policy." Black's Law Dictionary 818 (8th ed. 2004). "Excess insurance," on the other hand, is "[a]n agreement to indemnify against any loss that exceeds the amount of coverage under another policy." *Id.* at 816. "The primary insurer provides the first layer of insurance purchased by the insured, whether the coverage is from the first dollar of loss or subject to a high deductible." 1 R. Persons & K. Brownlee, Excess Liability: Rights and Duties of Commercial Risk Insureds and Insurers § 5:3, at 5-2 (4th ed. 1999). "Large organizations such as corporations or large governmental agencies often have many layers of excess liability coverages in order to achieve the maximum protection they seek." *Id.* at § 5:4, at 5-6. "Excess . . . insurance over a qualified purely self-insured retention of risk would not be considered 'primary;' the self-insurance itself is the 'primary' layer." *Id.* at § 5:3, at 2. The excess policies that Century issued to Boston Gas in this case provided the first layer of excess coverage over Boston Gas's primary layer of self-insurance.

occurrence based, meaning that (subject to any self-insured retention,[8] policy limits, and other terms and conditions) Century would indemnify Boston Gas for its "ultimate net loss" for liabilities stemming from, among other things, property damage caused by an "occurrence." The definitions of "ultimate net loss" and "occurrence" varied slightly among the policies. Other terms of the policies varied as well.

a. *1951-1960.* The first Century policy, XPL-3392, was in effect during the years from 1951 to 1960. This policy was lost, but a jury hearing the case in the Federal District Court found that the policy had a $1 million policy limit in 1951 and from 1955-1960, and a limit of $500,000 from 1952 to 1954. The jury did not determine the amount of the lost policy's self-insured retention. The jury did not determine the other terms of this policy, nor are they apparent from the record, but the parties do not dispute that they were occurrence-based policies.

b. *1960-1966.* The second Century policy, XPL-5607, was in effect during the years 1960 to 1966. This policy had a per occurrence limit of $1 million and a self-insured retention of $100,000. In the insuring agreement, Century agreed: ·

> "[T]o indemnify [Boston Gas] for *ultimate net loss* in excess of the retained limit . . . which [Boston Gas] may sustain by reason of the liability imposed upon [it] by law, or assumed by [it] under contract or agreement . . . [f]or damages because of injury to or destruction of property, including the loss of use thereof, caused by an occurrence as defined herein" (emphasis added).

The policy defined "occurrence" as:

> "[E]ither an accident happening during the policy period

---

[8] A self-insured retention bears some resemblance to a deductible. A "self-insured retention" is "[t]he amount of an otherwise-covered loss that is not covered by an insurance policy and that usu[ally] must be paid before the insurer will pay benefits . . . ." Black's Law Dictionary, *supra* at 1391. A deductible, on the other hand, is "the portion of the loss to be borne by the insured before the insurer becomes liable for payment." *Id.* at 444. "The difference between a self-insured retention and a deductible is usually that, under policies containing a self-insured retention, the insured assumes the obligation of providing itself a defense until the retention is exhausted." 2 A.D. Windt, Insurance Claims and Disputes § 11:31, 11-495 (5th ed. 2007).

or a *continuous or repeated exposure to conditions* which unexpectedly and unintentionally *causes injury to or destruction of property during the policy period.* All damages arising out of such exposure to substantially the same general conditions shall be considered as arising out of one occurrence." (Emphasis added.)

The policy defined "ultimate net loss" as:

"[T]he *sum actually paid in cash in the settlement or satisfaction of losses for which [Boston Gas] is liable,* either by adjudication or compromise with the written consent of [Century], after making proper deductions for all recoveries and salvages collectible, and for other insurance that is in excess of the retained limit, but shall exclude all salaries of employees and office expenses of [Boston Gas] incurred in investigation, adjustment and litigation" (emphasis added).

In a section of the insuring agreement entitled, "Policy Period, Territory," the policy stated that it "applie[d] only to occurrences which happen during the policy period within the United States of America, its territories or possessions, or Canada." Finally, the policy contained the following "[o]ther insurance" clause:

"If other collectible insurance with any other insurer is available to [Boston Gas] covering a loss also covered hereunder (except insurance purchased to apply in excess of the limit of liability hereunder), the insurance hereunder shall be in excess of, and not contribute with, such other insurance. If collectible insurance under any other policy of [Century] is available to [Boston Gas], covering a loss also covered hereunder (other than underlying insurance of which the insurance afforded by this policy is in excess), [Century's] limit of liability shall in no event exceed the greater or greatest limit of liability applicable to such loss under this or any other such policy."

c. *1966-1969.* The third Century policy, XCP-3547, was in effect during the years 1966 to 1969. This policy had a per occurrence limit of $17 million and a self-insured retention of $100,000. The insuring agreement provided:

"[Century] will indemnify [Boston Gas] for ultimate net

454 Mass. 337 (2009)                343

Boston Gas Company *v.* Century Indemnity Company; Certain Underwriters at Lloyd's London.

loss in excess of the retained limit hereinafter stated which [Boston Gas] shall become legally obligated to pay as damages because of . . . property damage . . . to which this policy applies, caused by an occurrence."

The policy defined "[o]ccurrence," with respect to property damage, as "an accident, including injurious exposure to conditions, which results, during the policy period, in property damage neither expected nor intended from the standpoint of [Boston Gas]." "Property damage" was defined as "injury to or destruction of tangible property." The policy defined "ultimate net loss" as:

"[T]he sum actually paid or payable in cash in the settlement or satisfaction of losses for which [Boston Gas] is liable either by adjudication or compromise with the written consent of [Century], after making proper deduction for all recoveries and salvages collectible, but excludes all loss expenses and legal expenses (including attorneys' fees, court costs and interest on any judgment or award) and all salaries of employees and office expenses of [Boston Gas], [Century] or any underlying insurer so incurred."

In a section entitled, "Policy Period, Territory," the policy stated that it "applie[d] to personal injury, property damage or advertising offense which occurs anywhere during the policy period." Additionally, in the section setting forth the policy limits and Boston Gas's self-insured retention, the policy stated: "For the purpose of determining the limit of [Century's] liability, all damages arising out of continuous or repeated exposure to substantially the same general conditions shall be considered as arising out of one occurrence." Finally, the policy contained two "[o]ther insurance" clauses. The first, entitled "Other Insurance with [Century]," provided:

"If collectible insurance under any other policy of [Century] is available to [Boston Gas], covering a loss also covered hereunder, [Century's] total liability shall in no event exceed the greater or greatest limit of liability applicable to such loss under this or any other such policy provided, however, this does not apply to insurance with [Century] which is written as underlying insurance or which is written as excess insurance over the limit provided in this policy."

The second, entitled, "Other Insurance Not with [Century]," provided:

> "If collectible insurance with any other insurer is available to [Boston Gas] covering a loss also covered hereunder the insurance hereunder shall be in excess of, and not contribute with such other insurance, provided, however, this does not apply to insurance which is written as excess insurance over the limit provided in this policy."

3. *Procedural history.* On August 4, 1995, after it had investigated and begun to clean the Everett site, Boston Gas wrote to Century, placing it on notice that Boston Gas might seek indemnification for the costs associated with its investigation and cleanup of the contaminated soils and groundwater at and near the Everett site. Century "reserved its rights," and on October 22, 2002, Boston Gas filed a diversity action against Century in the United States District Court for the District of Massachusetts. Boston Gas sought a declaratory judgment as to Century's obligations under the insurance policies and damages for Century's breach of the policies. Century asserted a counterclaim and brought third-party claims against other Boston Gas insurers. A three-week jury trial between Boston Gas and Century ensued, which focused on the Everett site.[9]

In the Federal District Court proceeding, Boston Gas argued that to recover under the insurance policies, it had to prove only that an occurrence had caused some off-site property damage during the policy periods.[10] Boston Gas claimed that various "leaks and spills" of tars and oils caused "continuous contamination" of the Everett site (an "occurrence"), which led to off-site property damage. Such off-site property damage, according to Boston Gas, required Century to indemnify Boston Gas for all of its liabilities (its "ultimate net loss," in the language of the policies) connected to the occurrence. Century countered by arguing that various exclusions in the policies precluded or

---

[9]The other twenty-eight Boston Gas MGPs remain the subject of a larger dispute. Boston Gas intends to use the outcome of the Everett case as an exemplar to establish its rights against Century with respect to the other sites.

[10]At least the XPL-5607 and XCP-3547 policies had exclusions for "property owned by" Boston Gas. The jury made no specific finding as to whether the XPL-3392 policy had a similar owned property exclusion.

limited indemnification. The jury ultimately found Century liable, and awarded Boston Gas $ 6,227,327.90 in damages for the costs it incurred in the investigation and cleanup of the environmental contamination at the Everett site.[11]

The issue that remained was whether and how those damages were to be allocated among the various insurers whose policies had been triggered by the environmental contamination at the Everett site. Boston Gas argued that under Massachusetts law Century was liable to Boston Gas for the entire damages award, and would then be entitled to seek contribution from Boston Gas's other insurers. See *Rubenstein* v. *Royal Ins. Co.*, 44 Mass. App. Ct. 842, 852 (1998), *S.C.*, 429 Mass. 355 (1999) (applying joint and several allocation method). See also *Chicago Bridge & Iron Co.* v. *Certain Underwriters at Lloyd's, London*, 59 Mass. App. Ct. 646, 648, 654-661 (2003) (applying joint and several allocation method under Illinois law). Century argued that the damages should be prorated among all of the insurers who provided coverage for the risk over the life of the Everett site, and sought certification of the allocation question to this court. See *A.W. Chesterton Co.* v. *Massachusetts Insurers Insolvency Fund*, 445

_____

[11]The special verdict form asked the jury: "What is the amount Boston Gas Company has been legally obligated to pay for the investigation and cleanup as a result of the property damage at the Everett site *caused during the years for which it had coverage*?" (emphasis added). Boston Gas reads this question as asking the jury what Boston Gas's liability was as a result of property damage that happened from 1951 to 1969. Thus, Boston Gas understands the $6,227,327.90 figure to represent the jury's finding that Boston Gas incurred over $6.2 million in liability for property damage that happened solely from 1951 to 1969. Century does not read the question so narrowly. It understands the $6.2 million figure to represent all of Boston Gas's liability for property damage that happened over a much longer period than merely 1951 to 1969.

At trial, Boston Gas did not attempt to prove that the $6.2 million figure resulted only from property damage from 1951 to 1969. In fact, before trial, Boston Gas argued that it would be "impossible" to prove the extent of property damage during the policy periods or the fraction of Boston Gas's losses attributable to pollution during the policy periods. Boston Gas has argued before us that it need only prove that some damage occurred during a Century policy period in order to trigger Century's obligation to indemnify Boston Gas for all losses caused by property damage, even if some of the property damage took place outside the policy period. It thus appears that the jury verdict encompasses Boston Gas's liability for property damage at the Everett site over a much longer period than just 1951 to 1969. In any event, the ultimate allocation decision will be made in the Federal court proceeding (that is, whether to allocate across 1951 to 1969, or another, longer period).

Mass. 502, 506 & n.3 (2005) (noting that Appeals Court adopted "all sums" over "pro rata" approach in two cases, but reserving issue for future decision because neither party challenged "all sums" approach). The Federal District Court judge denied Century's request for certification, concluding that *"Rubenstein* [v. *Royal Ins. Co.,* 44 Mass. App. Ct. 842 (1998), *S.C.,* 429 Mass. 355 (1999),[12]] and its progeny . . . compel me to adopt the 'all sums,' joint-and-several allocation method." The judge also reasoned that certification was not appropriate because Century's ability to "effectively allocate liability among all triggered insurers via a contribution claim" meant that the allocation issue was not outcome-determinative. See S.J.C. Rule 1:03 (providing for certification of "questions of law of this State which may be determinative of the cause").

The judge then entered separate and final judgment as to the Everett site under Fed. R. Civ. P. 54 (b). Applying the joint and several allocation method, the judge ruled that Boston Gas was entitled to select from which Century policy it would seek indemnification. Boston Gas chose the XCP-3547 policy, which had a per occurrence limit of $17 million and a per occurrence self-insured retention of $100,000. Accordingly, the judge awarded Boston Gas $6,127,327.90, which was the difference between the amount that the jury awarded to Boston Gas and the self-insured retention under the XCP-3547 policy.[13] The judge also issued a declaratory judgment obligating Century to pay all future costs associated with the investigation and environmental cleanup of the Everett site. Century appealed from this judgment.

On appeal to the United States Court of Appeals for the First Circuit (First Circuit), Century challenged the Federal District Court judge's application of the joint and several allocation method. *Boston Gas Co.* v. *Century Indem. Co.,* 529 F.3d 8, 12 (1st Cir. 2008). After noting that the Massachusetts Supreme Judicial Court "has not yet resolved [the] allocation question," the First Circuit surveyed the merits of both "pro rata allocation" and "joint and several allocation." *Id.* at 13-15. The court

---

[12] See discussion at 353-354, *infra.*

[13] The contamination was treated as one "occurrence." The XCP-3547 policy provided that "all damages arising out of continuous or repeated exposure to substantially the same general conditions shall be considered as arising out of one occurrence."

also noted the split of authority among other States, concluding that a "growing plurality" of States apply pro rata allocation, while "a significant number" of other States apply joint and several allocation. *Id.* at 13-14 & nn. 6-7. See notes 26 and 29, *infra*. The First Circuit then certified the three questions set forth above because it "found no controlling [Supreme Judicial Court] precedent on the allocation question and the issue is determinative of the scope of Boston Gas'[s] claim." *Boston Gas Co.* v. *Century Indem. Co., supra* at 15. We turn now to the certified questions.[14]

*Discussion.* 1. *Pro rata versus joint and several allocation.*[15] The first certified question requires us to decide how to allocate liability for long-term environmental contamination where a

---

[14]The United States Court of Appeals for the First Circuit also addressed several other issues in its opinion that are not relevant to our resolution of the certified questions. See *Boston Gas Co.* v. *Century Indem. Co.*, 529 F.3d 8, 15-23 (1st Cir. 2008). The court found error in a special verdict question about the owned property exclusion in Century's policies, which requires the case to be remanded for a new trial on that issue to ensure that the jury award encompasses only remediation costs necessary to protect against off-site, as opposed to solely on-site, contamination. *Id.* at 15-17. The court also ordered an adjustment to the declaratory judgment on remand, concluding that it could be read too broadly. *Id.* at 19-20. Additionally, the court corrected an erroneous calculation of statutory prejudgment interest. *Id.* at 20-22. Finally, the court rejected Century's other arguments, which involved the exclusion of a supplementary report by one of Century's experts, jury instructions on the "expected or intended" defense, and the jury's findings as to the terms of the XPL-3392 policy. *Id.* at 17-19, 22-23.

[15]Boston Gas argues that the factual premise of the first certified question (i.e., that Century provided coverage for less than the full period of years in which contamination occurred) "is nonexistent" because it "is precisely what the jury did not find." In its opinion accompanying the certification order, however, the First Circuit noted that in addition to the jury's finding that the Everett site was contaminated during the Century policy periods (1951 to 1969), "contamination seemingly occurred over a much longer period, even though no findings were made as to duration." *Boston Gas Co.* v. *Century Indem. Co., supra* at 12.

While the jury were not asked to make specific findings as to the duration of the contamination, the record supports the First Circuit's conclusion that contamination apparently took place outside the Century policy periods. The record includes reports prepared by the engineering firms Metcalf & Eddy and GEI Consultants, Inc., that conclude that the Everett site was contaminated by 1950 and continued to suffer contamination in 2005. Both of these reports were introduced in evidence at trial. Moreover, Boston Gas's own expert testified at trial that the Everett site suffered contamination from at least 1948 (and perhaps much earlier) until the present day. Consistent with this testimony,

policyholder sues one of its CGL insurers that provided coverage for the risk (was "on the risk") for only a portion of the time during which the contamination took place. This allocation issue commonly arises in the context of insurance disputes involving so-called "long-tail claims"[16] for injuries caused by environmental damage and toxic exposure. See 15 G. Couch, Insurance § 220:25, at 220-26 (3d ed. 2005). These long-tail claims cause problems for courts because "[e]nvironmental damage and toxic exposure cases often involve injuries that occur over a number of years, known as 'progressive injuries.' " Comment, Allocating Progressive Injury Liability Among Successive Insurance Policies, 64 U. Chi. L. Rev. 257, 257 (1997). In the ordinary case of a nonprogressive injury (e.g., motor vehicle accident or one identified tar spill), the policy in place at the time the covered damage or injury took place would cover all consequential damages, even those taking place after the policy period. 2 A.D. Windt, Insurance Claims and Disputes § 11:4, at 11-111 (5th ed. 2007).[17] Progressive injuries like the environmental contamination in this

counsel for Boston Gas argued during his summation to the jury that contamination occurred at the Everett site from at least 1948 until the present day. Before trial, counsel for Boston Gas argued that there had been "continuous property damage" at the Everett site that began "well before [the] 1950 [Metcalf & Eddy] study." Finally, counsel for Boston Gas conceded at oral argument before this court that Boston Gas had argued in the Federal District Court that there was "ongoing property damage" at the Everett site. Accordingly, we assume, for the purposes of answering the First Circuit's certified questions, that contamination occurred outside the Century policy periods. Any further factual development is left to the Federal court.

[16]"Long-tail claims" are those that can "occur many years after the triggering event and the expiration of the insurance policy." *Matter of the Liquidation of Am. Mut. Liab. Ins. Co.*, 434 Mass. 272, 291 (2001). "Most insurance policies issued before the mid-1980s provided 'occurrence' based coverage rather than 'claims-made' coverage. As a result, the insurance policies were said to have a 'long-tail' of coverage that applied to claims brought long after the occurrence that gave rise to the claim of liability." Bratspies, Splitting the Baby: Apportioning Environmental Liability Among Triggered Insurance Policies, 1999 BYU L. Rev. 1215, 1217 n.13.

[17]"[C]onsider the simple case of an automobile accident in 1994 with a definite prognosis that an injured occupant's spine will deteriorate in 1996 resulting eventually in paralysis. The policy in effect during 1994 must indemnify for all damages attributable to the 1994 accident even though the full extent of the damages or the injury will not take place until a future date." *Owens-Illinois, Inc.* v. *United Ins. Co.*, 138 N.J. 437, 465, 478-480 (1994).

case are different.[18] Progressive injuries of this type are "indivisible injuries attributable to ongoing events without a single clear 'cause.' " *Boston Gas Co.* v. *Century Indem. Co.*, 529 F.3d 8, 13 (1st Cir. 2008). "Progressive injuries frequently occur over time periods in which a liable party had insurance coverage under several different insurance policies, often provided by a number of insurance companies." Comment, *supra.* As the First Circuit recognized, "[t]he language of traditional [CGL] policies drafted before such law suits became common[19] — does not neatly map onto these types of injuries."[20] *Boston Gas Co.* v. *Century Indem. Co.*, *supra*, citing Hickman, Allocation of Environmental Cleanup Liability Between Successive Insurers, 17 N. Ky. L. Rev. 291, 292 (1990). Thus, courts struggle with the two analytically distinct concepts of (1) the trigger of coverage and (2) the scope of coverage under triggered CGL policies.

" 'Trigger of coverage' is a term of art whereby the court describes what must occur during the policy period for potential coverage to commence under the specific terms of an insurance policy." *A.W. Chesterton Co.* v. *Massachusetts Insurers Insolvency Fund*, 445 Mass. 502, 518 (2005), quoting *Rubenstein* v.

---

[18]The progressive injury in this case was environmental contamination caused by various spills and leaks that took place before, during, and after the Century policy periods.

[19]For example, the Federal Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA) was enacted in 1980. See 42 U.S.C. §§ 9601 et seq. The Massachusetts Oil and Hazardous Material Release Prevention Act, which is the State analogue to CERCLA, was enacted in 1983. See G. L. c. 21E, inserted by St. 1983, c. 7, § 5.

[20]"Most liability policies are designed to respond to losses, such as automobile accidents, which occur instantaneously. Losses of this nature are relatively easy to identify because damages are both immediate and finite, and can be measured quite simply against the limits of the policy or policies in effect on the date of the accident.

"On the other hand, losses where damage develops unrecognized over an extended period of time, such as bodily injury claims for toxic exposures and property damage claims for environmental contamination, are more difficult to pinpoint both in time and in degree. In these cases, correlating degrees of damage to particular points along the loss timeline may be virtually impossible. This has led to substantial uncertainty as to how responsibility for such losses should be allocated where multiple insurers have issued successive policies to the insured over the period of time the damage was developing." Hickman, Allocation of Environmental Cleanup Liability Between Successive Insurers, 17 N. Ky. L. Rev. 291, 292 (1990).

*Royal Ins. Co.*, 44 Mass. App. Ct. 842, 850 n.6 (1998). "[C]ourts have adopted four trigger of coverage approaches: (1) manifestation; (2) injury-in-fact or actual damage; (3) exposure; and (4) continuous."[21] 23 E.M. Holmes, Appleman on Insurance § 145.3[B][1], at 13-14 (2d ed. 2003). We rejected the manifestation trigger theory in an environmental contamination case involving CGL language very similar to the language in the Century policies here, see *Trustees of Tufts Univ. v. Commercial Union Ins. Co.*, 415 Mass. 844, 853-855 (1993), and have not yet had occasion to adopt one of the other trigger theories in the context of environmental contamination. We do not address the trigger issue in this case, however, because it is outside the ambit of the certified questions.

Instead, we focus our analysis on the scope of coverage that the triggered CGL policies must provide in a case such as this.[22] Courts in other jurisdictions have struggled to define the scope of coverage where successive CGL policies are triggered by long-tail claims for injuries which take place over many years and are caused by environmental damage or toxic exposure. In most of these cases, "it is both scientifically and administratively impossible to allocate to each policy the liability for injuries occurring only within its policy period." Comment, Allocating Progressive Injury Liability Among Successive Insurance Policies, 64 U. Chi. L. Rev. 257, 257-258 (1997). See 15 G. Couch, Insurance § 220:25, at 220-26 (3d ed. 2005) (with respect to "environmental damage and toxic exposure cases . . . it is virtually impossible to allocate to each policy the liability for injuries occurring only within its policy period"). "When it is impossible to determine the proportion of damage that occurred

[21]Manifestation trigger assigns the date of loss "to the policy period when property damage or actual damage is discovered, becomes known to the insured or a third party, or should have reasonably been discovered." 23 E.M. Holmes, Appleman on Insurance § 145.3[B][2], at 14 (2d ed. 2003). Injury-in-fact trigger "implicates all of the policy periods during which the insured proves some injury or damage." *Id.* at 15. Exposure trigger results in "all insurance contracts in effect when property was exposed to hazardous waste" being triggered. *Id.* at 16. Finally, continuous trigger posits that "any policy on the risk at any time during the continuing loss is triggered . . . from the date of initial exposure through manifestation." *Id.* at 17.

[22]By "scope of coverage," we mean the amount that Century must pay to satisfy its obligation to indemnify Boston Gas under the triggered CGL policies.

within each period, the law must allocate damages among the policies." Comment, *supra* at 258. Thus, "the courts are left with the nettlesome problem of how to allocate damages among the policies." 15 G. Couch, Insurance, *supra.*

Two principal approaches to the allocation issue have developed, leading to disagreement among State courts.[23] The first approach, generally preferred by policyholders, is often referred to as the "joint and several"[24] allocation method. Courts adopting this method typically hold:

> "[A]ny policy on the risk for any portion of the period in which the insured sustained property damage or bodily injury is jointly and severally obligated to respond in full, up to its policy limits, for the loss. Courts applying joint and several liability usually focus on a policy's 'all sums' language, which commonly states: '[t]he Company will pay on behalf of the insured all sums which the insured shall become legally obligated to pay.' Once a policy is triggered, an insurer becomes liable for all sums that it is legally obligated to pay, which may include those sums attributable to bodily injury or property damage that did not occur during the insurer's policy period."

---

[23]Not surprisingly, there is also disagreement among commentators about which approach is preferable. Compare, e.g., Comment, Allocating Progressive Injury Liability Among Successive Insurance Policies, 64 U. Chi. L. Rev. 257 (1997) (advocating proration by time on the risk), with Bratspies, Splitting the Baby: Apportioning Environmental Liability Among Triggered Insurance Policies, 1999 BYU L. Rev. 1215 (advocating "single-vertical allocation" between policyholder and insurers [essentially a form of joint and several allocation], followed by "time-on-the-risk" allocation among insurers).

[24]This allocation method is variously referred to as "joint and several," "all sums," "vertical exhaustion," and "vertical spike." S.M. Seaman & J.R. Schulze, Allocation of Losses in Complex Insurance Coverage Claims § 4.1, at 1 (2d ed. 2008). We shall use the term "joint and several," but we note that it is conceptually distinct from the tort concept of joint and several liability. "Since each insurer is responsible only for the policy limits it bargained for, it is not joint and several liability in the tort law sense where a tortfeasor deemed only 10 percent responsible is liable for 100 percent of the judgment if the other tortfeasors are insolvent or otherwise unavailable." Colon, Pay it Forward: Allocating Defense and Indemnity Costs in Environmental Liability Cases in California, 24 Ins. Litig. Rep. 43, 51 n.66 (2002). See also Stempel, Domtar Baby: Misplaced Notions of Equitable Apportionment Create a Thicket of Potential Unfairness for Insurance Policyholders, 25 Wm. Mitchell L. Rev. 769, 791 n.98, 816-817 & n.195 (1999) ("term joint and several liability is misleading in the insurance coverage context").

Jones, An Introduction to Insurance Allocation Issues in Multiple-Trigger Cases, 10 Vill. Envtl. L.J. 25, 37-38 (1999).

Courts applying the joint and several allocation method have required insurers to pay " 'all sums' for which the insured is liable, including triggered years in which the insured had no insurance." 23 E.M. Holmes, *supra* at § 145.4[A][2][a], at 21. "Most courts that have adopted the joint and several allocation method allow for the selection of only one policy regardless of whether or not any single policy alone will reimburse the policyholder to the full extent of its liability. Other courts will allow 'stacking' if one policy will not cover the policyholder's entire liability."[25] Colon, Pay it Forward: Allocating Defense and Indemnity Costs in Environmental Liability Cases in California, 24 Ins. Litig. Rep. 43, 53 (2002). "However . . . those insurers picked may then seek reimbursement from other triggered policies in a contribution action against other insurers." 23 E.M. Holmes, *supra*. The seminal case adopting the joint and several allocation method is *Keene Corp.* v. *Insurance Co. of N. Am.*, 667 F.2d 1034 (D.C. Cir. 1981), cert. denied, 455 U.S. 1007 (1982). A number of States, including Delaware, Indiana, Ohio, Pennsylvania, Washington, and Wisconsin, have adopted some form of the joint and several allocation.[26]

The second approach, generally favored by insurers, is usually referred to as the "pro rata" allocation method. Courts applying pro rata allocation typically "focus[] on the definitions of 'occurrence,' 'bodily injury' and 'property damage,' when read in conjunction with the 'Insuring Agreement,' to require the allocation of loss to a particular policy be proportionate to the damage suffered during that policy's term." 23 E.M. Holmes, *supra* at § 145.4[A][2][b], at 25. Pro rata allocation "assigns a dual purpose to the phrase 'during the policy period' in the CGL policy's

---

[25]"Stacking policy limits means that when more than one policy is triggered by an occurrence, each policy can be called upon to respond to the claim up to the full limits of the policy." Colon, *supra* at 53.

[26]See, e.g., *Hercules, Inc.* v. *AIU Ins. Co.*, 784 A.2d 481, 494 (Del. 2001); *Allstate Ins. Co.* v. *Dana Corp.*, 759 N.E.2d 1049, 1058 (Ind. 2001); *Goodyear Tire & Rubber Co.* v. *Aetna Cas. & Sur. Co.*, 95 Ohio St. 3d 512, 516-517 (2002); *J.H. France Refractories Co.* v. *Allstate Ins. Co.*, 534 Pa. 29, 39-42 (1993); *American Nat'l Fire Ins. Co.* v. *B & L Trucking & Constr. Co.*, 134 Wash. 2d 413, 428-429 (1998); *Plastics Eng'g Co.* v. *Liberty Mut. Ins. Co.*, 759 N.W.2d 613, 616 (Wis. 2009).

definition of 'occurrence.' The phrase serves both as a trigger of coverage and as a limitation on the promised 'all sums' coverage." Bratspies, Splitting the Baby: Apportioning Environmental Liability Among Triggered Insurance Policies, 1999 BYU L. Rev. 1215, 1234. Courts adopting this method allocate a portion of the total loss to each triggered policy using a variety of different formulas. See 23 E.M. Holmes, *supra* at § 145.4[A][2][b]-[d], at 24-32. See also S.M. Seaman & J.R. Schulze, Allocation of Losses in Complex Insurance Coverage Claims § 4.3[b], at 4-17 to 4-21 (2d ed. 2008) (describing nine pro rata allocation formulas). The pro rata "approach emphasizes that part of a long-tail injury will occur outside any particular policy period. Rather than requiring any one policy to cover the entire long-tail loss, [pro rata] allocation instead attempts to produce equity across time." Bratspies, *supra* at 1232. "One important feature of a pro rata allocation is that courts adopting this type of allocation generally require the policyholder to participate in the allocation . . . for those periods of no insurance, self-insurance, or insufficient insurance."[27] S.M. Seaman & J.R. Schulze, *supra* at § 4.3[c], at 4-21. See 23 E.M. Holmes, *supra* at § 145.4[A][2][b], at 27 ("In addition to satisfying self-insured retentions, the insured will typically bear responsibility for uninsured triggered years").[28] The seminal case adopting the pro rata allocation method is *Insurance Co. of N. Am.* v. *Forty-Eight Insulations, Inc.*, 633 F.2d 1212 (6th Cir. 1980). A number of States, including Colorado, Connecticut, Kansas, Kentucky, Minnesota, New Hampshire, New Jersey, New York, Vermont, and Utah, have adopted some form of pro rata allocation method.[29]

The Massachusetts Appeals Court has twice resolved the al-

---

[27]Some courts have recognized an exception to this rule where insurance was "unavailable." See note 41, *infra*.

[28]While most courts have held policyholders with occurrence-based policies responsible for a full per occurrence deductible or self-insured retention under each triggered policy, a minority of courts have prorated policyholders' deductibles. See S.M. Seaman & J.R. Schulze, *supra* at § 4.3[c][2][A] at 4-29 — 4-32.

[29]See, e.g., *Public Serv. Co. of Colo.* v. *Wallis & Cos.*, 986 P.2d 924, 935 (Colo. 1999); *Security Ins. Co.* v. *Lumbermens Mut. Cas. Co.*, 264 Conn. 688, 710 (2003); *Atchison, Topeka & Santa Fe Ry.* v. *Stonewall Ins. Co.*, 275 Kan. 698, 753-754 (2003); *Aetna Cas. & Sur. Co.* v. *Commonwealth*, 179 S.W.3d 830, 842 (Ky. 2005); *Domtar, Inc.* v. *Niagara Fire Ins. Co.*, 563 N.W.2d 724,

location question in favor of joint and several allocation. In *Rubenstein* v. *Royal Ins. Co.*, 44 Mass. App. Ct. 842, 843 (1998), a policyholder sued its insurers seeking indemnification and defense for liability stemming from an underground fuel oil leak and resulting soil contamination in Newton. The trial judge ruled that one of the insurers was obligated to indemnify the policy-holder for the full amount the policyholder paid to settle a lawsuit brought against it for the soil contamination. *Id.* at 845. Although the insurer's indemnity obligation was reduced by the amount the policyholder had received from other insurers that had settled, the judge did not allocate damages on a pro rata basis. *Id.* With little express analysis, the Appeals Court upheld the judge's failure to allocate damages on a pro rata basis. *Id.* at 852. The court relied primarily on the "all sums" policy language and the continuous nature of the contamination in reaching its conclusion. *Id.* at 852-853.

In *Chicago Bridge & Iron Co.* v. *Certain Underwriters at Lloyd's, London*, 59 Mass. App. Ct. 646, 648, 654-661 (2003), the Appeals Court again applied joint and several liability in the context of environmental contamination, but this time as a mat-ter of Illinois law. The court relied primarily on the policy lang-uage, which provided no "basis for limiting indemnification to only those damages occurring during the policy period." *Id.* at 658. Notably, the policy contained a provision, entitled "Prior Insurance and Non Cumulation of Liability," that addressed property damage occurring before and after the policy period.[30] *Id.* at 656. The court reasoned that this provision would be

732 (Minn. 1997); *EnergyNorth Natural Gas, Inc.* v. *Certain Underwriters at Lloyd's*, 156 N.H. 333, 344 (2007); *Owens-Illinois, Inc.* v. *United Ins. Co.*, 138 N.J. 437, 478-480 (1994); *Consolidated Edison Co. of N.Y.* v. *Allstate Ins. Co.*, 98 N.Y.2d 208, 224-225 (2002); *Sharon Steel Corp.* v. *Aetna Cas. & Sur. Co.*, 931 P.2d 127, 140-142 (Utah 1997); *Towns* v. *Northern Sec. Ins. Co.*, 964 A.2d 1150, 1167 (Vt. 2008).

[30]That provision stated: "It is agreed that if any loss covered hereunder is also covered in whole or in part under any other excess policy issued to the Assured prior to the inception date hereof the limit of liability hereon as stated in item 2 of the Declarations shall be reduced by any amounts due to the As-sured on account of such loss under such prior insurance.

"Subject to the foregoing paragraph and to all the other terms and condi-tions of this policy in the event that personal injury or property damage aris-ing out of an occurrence covered hereunder is continuing at the time of termination of this policy Underwriters will continue to protect the Assured

"superfluous had the drafter intended that damages would be allocated among insurers based on their respective time on the risk." *Id.* After reviewing several decisions from Illinois appellate courts, the Appeals Court rejected the pro rata approach in favor of joint and several allocation.[31] *Id.* at 656-661.

We have not yet considered the allocation question. In *A.W. Chesterton Co.* v. *Massachusetts Insurers Insolvency Fund*, 445 Mass. 502, 503, 506 n.3 (2005), a case involving asbestos-related liability claims, we reserved the issue for future decision because neither party challenged the joint and several allocation method used in that case. The First Circuit's certified questions now present us with an opportunity to consider the merits of pro rata versus joint and several allocation. Century and some amici urge us to apply the pro rata method of allocation. Boston Gas and some amici, on the other hand, advocate for joint and several allocation. In deciding which approach to adopt, we must look first to the policy language.

The interpretation of an insurance contract is a question of law. *Allmerica Fin. Corp.* v. *Certain Underwriters at Lloyd's, London*, 449 Mass. 621, 628 (2007), and cases cited. It "is no different from the interpretation of any other contract, and we must construe the words of the policy in their usual and ordinary sense." *Hakim* v. *Massachusetts Insurers' Insolvency Fund*, 424 Mass. 275, 280 (1997). "We read the policy as written and 'are not free to revise it or change the order of the words.' " *Id.* at 281, quoting *Continental Cas. Co.* v. *Gilbane Bldg. Co.*, 391 Mass. 143, 147 (1984). "Every word in an insurance contract 'must be presumed to have been employed with a purpose and must be given meaning and effect whenever practicable,' " *Allmerica Fin. Corp.* v. *Certain Underwriters at Lloyd's, London*, *supra*, quoting *Jacobs* v. *United States Fid. & Guar. Co.*, 417

---

for liability in respect of such personal injury or property damage without payment of additional premium." *Chicago Bridge & Iron Co.* v. *Certain Underwriters at Lloyd's, London*, 59 Mass. App. Ct. 646, 656 (2003).

[31]The Appeals Court cautioned that because "the policy here was first issued by [the defendant insurers] in 1961 . . . [o]ur analysis is confined to the policy language before us, and so does not necessarily bear on environmental coverage disputes involving more recent policies with different wording." *Chicago Bridge & Iron Co.* v. *Certain Underwriters at Lloyd's, London*, *supra* at 660 n.15.

Mass. 75, 77 (1994), "without according undue emphasis to any particular part over another." *Mission Ins. Co.* v. *United States Fire Ins. Co.*, 401 Mass. 492, 497 (1988), quoting *Woogmaster* v. *Liverpool & London & Globe Ins. Co.*, 312 Mass. 479, 481 (1942). "If in doubt, we 'consider what an objectively reasonable insured, reading the relevant policy language, would expect to be covered.' " *A.W. Chesterton Co.* v. *Massachusetts Insurers Insolvency Fund*, 445 Mass. 502, 518 (2005), quoting *Trustees of Tufts Univ.* v. *Commercial Union Ins. Co.*, 415 Mass. 844, 849 (1993). See *McGregor* v. *Allamerica Ins. Co.*, 449 Mass. 400, 402 (2007). Finally, "[a]ny ambiguities in the language of an insurance contract are interpreted against the insurer who used them and in favor of the insured."[32] *Allmerica Fin. Corp.* v. *Certain Underwriters at Lloyd's, London, supra.*

Century argues that the plain and unambiguous policy language of the XCP-3547 policy (the policy from which Boston Gas chose to recover in the Federal District Court), mandates application of the pro rata allocation method. Century reasons that the definition of "occurrence" establishes that the policy is triggered when Boston Gas demonstrates that "an accident" or "injurious exposure to conditions" resulted in property damage "during the policy period." Once the policy is triggered, Century argues (and subject to the policy's conditions and exclusions), the insuring agreement provides that Century will indemnify Boston Gas only for the "ultimate net loss" that Boston Gas is "legally obligated to pay [as damages] *'because of* . . . *'property damage'* . . . *'to which this policy applies'* " (emphasis in original). Century then looks to the "Policy Period, Territory" provision as supplying a definition of the phrase "to which this policy applies." That provision states that "[t]his policy applies to . . . *property damage* . . . which occurs anywhere *during the policy period*" (emphasis added). Century concludes that the policy provides coverage only for Boston Gas's liability resulting from property damage occurring during the policy period. Thus, a pro

---

[32]An ambiguity arises when there is more than one rational interpretation of the relevant policy language. *Trustees of Tufts Univ.* v. *Commercial Union Ins. Co.*, 415 Mass. 844, 849 (1993). "However, an ambiguity is not created simply because a controversy exists between parties, each favoring an interpretation contrary to the other." *Lumbermens Mut. Cas. Co.* v. *Offices Unlimited, Inc.*, 419 Mass. 462, 466 (1995).

rata allocation method is required by the policy language where, as here, the amount of contamination occurring during any one policy period cannot be accurately determined.

Boston Gas argues that the plain and unambiguous language in the Century policies compels the adoption of the joint and several allocation method. It agrees with Century that the definition of "occurrence" establishes what must happen for one of the polices to be triggered, that is, property damage happening during the policy period. However, it contends that once the policy is triggered, the "ultimate net loss" provision in the insuring agreement defines the scope of Century's obligation to indemnify Boston Gas. The Century policies define "ultimate net loss" as "the sum actually paid" by Boston Gas to settle or satisfy "losses" for which Boston Gas is "liable." Consequently, once a Century policy is triggered by property damage occurring during the policy period, Century must pay "the sum actually paid" by Boston Gas for its liability and not some prorated amount.

Boston Gas points to other provisions in the policies that it claims show that losses covered by a policy may result from damage that takes place outside the policy period. In describing the per occurrence policy limits, the policies treat "all damages arising out of continuous or repeated exposure to substantially the same general conditions . . . as arising out of one occurrence," to cap Century's liability for continuing damage at the per occurrence limit. In addition, the XCP-3547 policy contains a provision entitled "Other Insurance with [Century]" that provides that if another Century policy "is available" to Boston Gas "covering a loss also covered hereunder, [Century's] total liability shall in no event exceed the greater or greatest limit of liability applicable to such loss under this or any other such policy."

Boston Gas argues further that Century's reliance on the "Policy Period, Territory" provision as a limitation on the scope of coverage is misplaced. It maintains that the language that Century quotes is not a "definition" of the term "to which this policy applies," but rather a portion of an unrelated provision that establishes the period and geographic scope in which the triggering event must take place. In other words, the "Policy Period, Territory" provision relates only to the trigger of coverage and not to the scope of coverage.

Finally, Boston Gas points out that while the policies do not contain pro rata provisions for indemnification, the XCP-3547 policy does include a pro rata provision for defense costs.[33] It contends that Century could have inserted a proration provision for indemnification, but it chose not to.

We agree with Century that a pro rata allocation of losses is consistent with, if not compelled by, the most reasonable construction of the policies at issue here. In the XCP-3547 policy, Century promised to indemnify Boston Gas for the "ultimate net loss" that it became "legally obligated to pay as damages because of . . . *property damage . . . to which this policy applies*, caused by an occurrence" (emphasis added). The "Policy Period, Territory" provision then explains that "*[t]his policy applies to . . . property damage . . .* which occurs anywhere *during the policy period*" (emphasis added). In the XPL-5607 policy, Century promised to indemnify Boston Gas for the "ultimate net loss" that it "may sustain by reason of the liability imposed upon [it] by law, or assumed by [it] under contract or agreement . . . [f]or damages because of injury to or destruction of property, including the loss of use thereof, caused by an occurrence as defined herein." The "Policy Period, Territory" provision in that policy provides that "[t]his policy applies only to *occurrences* which happen *during the policy period*" (emphasis added). The policy defines an "occurrence," with respect to property damage, as "a continuous or repeated exposure to conditions which unexpectedly and unintentionally causes *injury to or destruction of property during the policy period*" (emphasis added). In other words, that policy applies only to injury to or destruction of property taking place during the policy period. This conclusion is further supported by a clause in the XPL-5607 policy's provisions limiting Century's liability, which states that there is no limit to the

---

[33]The "Defense, Settlement and Supplementary Payments" provision states that, in certain circumstances, Century "shall contribute to the legal costs in the ratio that its proportion of the liability for the judgment rendered, or settlement made, bears to the whole amount of said judgment or settlement."

The XPL-5607 policy has a virtually identical provision, titled "Legal Costs," which states that, in certain circumstances, Century "shall contribute to the costs in the ratio that its proportion of the liability for the judgment rendered, or settlement made, bears to the whole amount of said judgment or settlement."

454 Mass. 337 (2009)                                      359

Boston Gas Company *v.* Century Indemnity Company; Certain Underwriters at Lloyd's London.

number of occurrences for which Boston Gas can make claims, "provided such occurrences happen *during the policy period*" (emphasis added). The most reasonable reading of these provisions is that the Century policies provided coverage for that portion of Boston Gas's liability attributable to the quantum of property damage occurring during a given policy period. Our reading of this policy language is consistent with that of other courts that have construed CGL policies with similar provisions limiting the applicability of a policy to property damage that occurs during the policy period.[34]

Moreover, this limitation of coverage to liability resulting from property damage during the policy period derives from the definition of "occurrence" in the Century policies. In the XCP-3547 policy, an "occurrence," with respect to property damage, is "an accident, including injurious exposure to conditions, which results,

---

[34]See, e.g., *Olin Corp.* v. *Insurance Co. of N. Am.*, 221 F.3d 307, 324 (2d Cir. 2000) (court deemed policy language limiting coverage to "accident" or "property damage" "during the policy period" "at least consistent with" pro rata allocation); *Insurance Co. of N. Am.* v. *Forty-Eight Insulations, Inc.*, 633 F.2d 1212, 1227-1228 (6th Cir. 1980) (pro rata allocation where "Policy Period, Territory" provisions limit coverage to injury or damage during policy period); *Domtar, Inc.* v. *Niagara Fire Ins. Co.*, 563 N.W.2d 724, 731 (Minn. 1997) (pro rata allocation where "[t]his policy applies . . . to occurrences during the policy period anywhere in the world . . ."); *Northern States Power Co.* v. *Fidelity & Cas. Co.*, 523 N.W.2d 657, 659 (Minn. 1994) (pro rata allocation where "[t]his policy applies only to occurrences which occur during the policy period . . ."); *Consolidated Edison Co. of N.Y.* v. *Allstate Ins. Co.*, 98 N.Y.2d 208, 222 (2002) (pro rata allocation where "[t]his policy applies only to 'occurrences' as defined herein, happening during the policy period"). See also *Towns* v. *Northern Sec. Ins. Co.*, 964 A.2d 1150, 1166 (Vt. 2008) (pro rata by time on the risk "is most consistent with . . . the standard occurrence-based policy provision limiting coverage to damages occurring *during* the policy term on which it is based" [emphasis in original]). See generally S.M. Seaman & J.R. Schulze, Allocation of Losses in Complex Insurance Coverage Claims § 4.2[b], at 4-8 (2d ed. 2008) ("Although pre-1986 [CGL] contracts often contain language to the effect that the contract covers *'all sums* which the insured shall become legally obligated to pay . . . as damages,' the contracts expressly modify this phrase to make clear that 'all sums' is limited to damages *'to which this policy applies.'* Further, the contracts provide coverage only for the damages that take place *'during the policy period'* " [emphasis added]). Contrast *Plastics Eng'g Co.* v. *Liberty Mut. Ins. Co.*, 759 N.W.2d 613, 625 (Wis. 2009) (adopting "all sums" allocation where policy expressly covered property damage occurring "partly before and partly within the policy period" and contained no "Policy Period, Territory" provision limiting coverage to property damage occurring during policy period).

*during the policy period,* in property damage neither expected nor intended from the standpoint of [Boston Gas]" (emphasis added). In the XPL-5607 policy, an "occurrence," with respect to property damage, is "an accident happening *during the policy period* or a continuous or repeated exposure to conditions which unexpectedly and unintentionally causes injury to or destruction of property *during the policy period*" (emphasis added). We read the phrase "during the policy period" in the definitions of "occurrence" as limiting the promised "ultimate net loss" coverage. See *EnergyNorth Natural Gas, Inc.* v. *Certain Underwriters at Lloyd's,* 156 N.H. 333, 340 (2007), citing Bratspies, Splitting the Baby: Apportioning Environmental Liability Among Triggered Insurance Policies, 1999 BYU L. Rev. 1215, 1234 ("To courts adopting [pro rata allocation], the phrase 'during the policy period' in the policy's definition of 'occurrence' limits the promised 'all sums' coverage"). This limitation makes sense: property damage during the policy period triggers the Century policies, which then respond by providing coverage for liability attributable to the amount of property damage occurring during the policy period.

We reject Boston Gas's interpretation of the Century policies for several reasons. First, like other policyholders focusing on the phrase "all sums," Boston Gas ignores a fundamental principle of insurance contract interpretation by placing undue emphasis on the phrase "ultimate net loss." See *Mission Ins. Co.* v. *United States Fire Ins. Co.,* 401 Mass. 492, 497 (1988), quoting *Woogmaster* v. *Liverpool & London & Globe Ins. Co.,* 312 Mass. 479, 481 (1942) ("insurance policies should be construed as a whole 'without according undue emphasis to any particular part over another' "). See also *Consolidated Edison Co. of N.Y.* v. *Allstate Ins. Co.,* 98 N.Y.2d 208, 222, 224 (2002) (policyholder's "singular focus on 'all sums' " would read out policy's limitation of coverage to liability caused by occurrences happening during policy period). Boston Gas's reading of the policies overlooks the limitation that the phrase "during the policy period" places on the scope of coverage. See *id.* at 224 ("joint and several allocation is not consistent with the language of the policies providing indemnification for ['ultimate net loss'] . . . that resulted from an accident or occurrence 'during the policy period' ").

Second, the other provisions that Boston Gas points to do not support its position that losses covered by a Century policy may result from damage that takes place outside the policy period. For example, in the clause setting forth Century's limits of liability, the XCP-3547 policy provides that "all damages arising out of continuous or repeated exposure to substantially the same general conditions shall be considered as arising out of one occurrence." The XPL-5607 policy contains an almost identical provision in its definition of "occurrence."[35] Nothing in the provisions necessarily implies, however, that they refer to "continuous or repeated exposure to substantially the same general conditions" outside the policy period. It is equally plausible to read those provisions as applying to "continuous or repeated exposure to substantially the same general conditions" during the policy period. Moreover, these provisions govern only the number of occurrences for purposes of determining the limit of Century's liability; they do not expand coverage for damages occurring outside the policy period.

Similarly, the policies' "other insurance" clauses do not reflect an intention to cover losses from damage outside the policy period. Rather, the "other insurance" clauses simply reflect a recognition of the many situations in which concurrent, not successive, coverage would exist for the same loss.[36] For example, we resolved a conflict between "other insurance" clauses in *Mission Ins. Co.* v. *United States Fire Ins. Co.*, 401 Mass. 492,

---

[35]The XPL-5607 policy provides: "All damages arising out of such exposure to substantially the same general conditions shall be considered as arising out of one occurrence."

[36]" 'Other insurance' refers only to two or more concurrent policies, which insure the same risk and the same interest, for the benefit of the same person, during the same period. However, 'other insurance' clauses are not intended to allocate liability among successive insurers because they do not insure the same risk and would unjustly make consecutive insurers liable for damages occurring outside their policy periods." 23 E.M. Holmes, Appleman on Insurance § 145.4[C], at 34 (2d ed. 2003).

"Historically, 'other insurance' clauses were designed to prevent multiple recoveries when more than one policy provided coverage for a given loss. . . . An example of a typical multiple-coverage case is the situation in which a loss is incurred by an insured driver while driving an automobile of an insured owner with the owner's permission. . . . In such a case both policies clearly cover the entire loss." (Citations omitted.) *Owens-Illinois, Inc.* v. *United Ins. Co.*, 138 N.J. 437, 470 (1994).

492-493 (1988), where one insurer issued an umbrella liability policy to the lessor of a vehicle involved in a motor vehicle accident and another insurer issued a liability policy to the lessee. The "other insurance" clauses were implicated in that case because the policies were concurrent and thus, in the absence of other insurance, each policy would have provided coverage for the losses from the accident. *Id.* at 493. Similarly, "other insurance" clauses like the ones in the Century policies might come into play where two concurrent policies, one issued to a parent company and one to a subsidiary, both insure the subsidiary. This is not a successive coverage situation, but simply one in which two concurrent policies insure the same loss. Nothing about the "other insurance" clauses necessarily means that the policies were intended to cover losses occurring long before or after the policy period.

Significantly, the XCP-3547 and XPL-5607 policies do not contain clauses that expressly provide for continuing coverage beyond the policy period. See, e.g., *Chicago Bridge & Iron Co.* v. *Certain Underwriters at Lloyd's, London*, 59 Mass. App. Ct. 646, 656 (2003); *Liberty Mut. Ins. Co.* v. *Those Certain Underwriters at Lloyds*, 650 F. Supp. 1553, 1559 (W.D. Pa. 1987); *Hercules, Inc.* v. *AIU Ins. Co.*, 784 A.2d 481, 493-494 (Del. 2001). For example, the policy in *Chicago Bridge* provided:

> "[I]n the event that personal injury or property damage arising out of an occurrence covered hereunder is continuing at the time of termination of this policy [the insurer] will continue to protect the [policyholder] for liability in respect of such personal injury or property damage without payment of additional premium."

*Chicago Bridge & Iron Co.* v. *Certain Underwriters at Lloyd's, London, supra.* Courts have recognized that such a provision is inconsistent with pro rata allocation because it expressly provides for coverage outside the policy period. See, e.g., *id.*; *Hercules, Inc.* v. *AIU Ins. Co., supra*; *Liberty Mut. Ins. Co.* v. *Those Certain Underwriters at Lloyds, supra* at 1559-1560.

Further, we doubt that an objectively reasonable insured reading the relevant policy language would expect coverage for li-

ability from property damage occurring outside the policy period. Read as a whole, neither Century policy expressly makes or implies a promise to pay one hundred per cent of Boston Gas's liability for multi-year pollution damage occurring decades before or after the policy period. No reasonable policyholder could have expected that a single one-year policy would cover all losses caused by toxic industrial wastes released into the environment over the course of several decades. Any reasonable insured purchasing a series of occurrence-based policies would have understood that each policy covered it only for property damage occurring during the policy year.

> "[T]here is no logic to support the notion that one single insurance policy among 20 or 30 years worth of policies could be expected to be held liable for the entire time period. Nor is it reasonable to expect that a single-year policy would be liable, for example, if the insured carried no insurance at all for the other years covered by the occurrence."

*Public Serv. Co. of Colo.* v. *Wallis & Cos.*, 986 P.2d 924, 940 (Colo. 1999). See *Security Ins. Co.* v. *Lumbermens Mut. Cas. Co.*, 264 Conn. 688, 710 (2003) ("Neither the insurers nor the insured could reasonably have expected that the insurers would be liable for losses occurring in periods outside of their respective policy coverage periods"). Accordingly, the Century policies are not ambiguous because they admit of only one reasonable interpretation. See *Hazen Paper Co.* v. *United States Fid. & Guar. Co.*, 407 Mass. 689, 700 (1990) ("If there are two rational interpretations of policy language, the insured is entitled to the benefit of the one that is more favorable to it"). In the absence of ambiguity, we decline to construe the policies in favor of the insured.[37]

We are not persuaded by either *Rubenstein* v. *Royal Ins. Co.*,

---

[37]A number of other courts adopting the pro rata allocation method have deemed similar policy language unambiguous, and thus declined to construe the policies in favor of the insured to provide for joint and several allocation. See, e.g., *Public Serv. Co. of Colo.* v. *Wallis & Cos.*, 986 P.2d 924, 939-940 (Colo. 1999) (policies not ambiguous because "pick and choose" allocation method not reasonable interpretation); *Security Ins. Co.* v. *Lumbermens Mut. Cas. Co.*, 264 Conn. 688, 710-711 (2003) ("Although we are bound to construe ambiguities in favor of the insured . . . we cannot torture the insurance policy

364 454 Mass. 337 (2009)

Boston Gas Company *v.* Century Indemnity Company; Certain Underwriters at Lloyd's London.

44 Mass. App. Ct. 842 (1998), or *Chicago Bridge & Iron Co.* v. *Certain Underwriters at Lloyd's, London,* 59 Mass. App. Ct. 646 (2003), to adopt the joint and several allocation method. As the First Circuit noted, *Rubenstein*'s treatment of the allocation issue was indeed cursory and focused solely on the policy's "all sums" language to the exclusion of any other policy language. See *Rubenstein* v. *Royal Ins. Co., supra* at 852-853. As for *Chicago Bridge,* it was decided under Illinois law. *Chicago Bridge & Iron Co.* v. *Certain Underwriters at Lloyd's, London, supra* at 648. To the extent that the analysis of the policy language in *Chicago Bridge* was not unique to Illinois law, two key differences in the language cause us to reach a different result here. First, unlike the Century policies, the policy in *Chicago Bridge* contained a "noncumulation clause" that expressly provided for coverage, in certain circumstances, for property damage continuing after the policy period ended. *Id.* at 656. See note 30, *supra.* Second, unlike the Century policies here, the policy in *Chicago Bridge* apparently did not contain a "Policy Period, Territory" provision limiting the applicability of the policy to property damage happening during the policy period. Given these differences, we do not read *Chicago Bridge* as foreclosing the possibility that the definition of "occurrence" might have some bearing on the scope of coverage under a CGL policy. Therefore, we are not persuaded by *Rubenstein* or *Chicago Bridge* to apply joint and several allocation in the circumstance of this case.

Finally, adopting pro rata allocation is not only consistent with the policy language at issue here, but it also serves important public policy objectives. As the Supreme Court of New Hampshire recently stated:

> "[T]he joint and several allocation method is improvident. It 'does not solve the Allocation problem; it merely postpones it.' . . . This method 'divides the case into two separate suits: in the first suit, the insured selects and sues one of the triggered insurers; in the second suit, the selected

language in order to provide [the policyholder] with uninterrupted insurance coverage where there was none" [citation omitted]); *Consolidated Edison Co. of N.Y.* v. *Allstate Ins. Co.,* 98 N.Y.2d 208, 224 (2002) (joint and several allocation inconsistent with "unambiguous language" of policies).

insurer then sues other triggered insurers for contribution.'
. . . In this way, despite its advocates' claims to the contrary,
the joint and several method does not decrease litigation
costs, does not give courts guidance as to how to allocate
liability, and requires insurers to 'factor the costs of un-
certain liability into their premiums.' " (Citations omitted.)

*EnergyNorth Natural Gas, Inc.* v. *Certain Underwriters at
Lloyd's*, 156 N.H. 333, 345 (2007), quoting Comment, Allocat-
ing Progressive Injury Liability Among Successive Insurance
Policies, 64 U. Chi. L. Rev. 257, 271 (1997). The United States
Court of Appeals for the Second Circuit recognized similar
benefits of pro rata allocation:

"[W]here the policies triggered are provided by multiple
insurers, [pro rata] allocation avoids saddling one insurer
with the full loss, the burden of bringing a subsequent
contribution action, and the risk that recovery in such an
action will prove to be impossible because, for instance,
the insurer of other triggered policies is unable to pay.
. . . Allocation results in the insured bearing the risk of
any of its insurers' inability to pay, instead. There is logic
in having the risk of such defalcation fall on the insured,
which purchased the defaulting insurer's policy, rather
than on another insurer which was a stranger to the selec-
tion process.

"Allocation also forces an insured to absorb the losses for
periods when it self-insured and can prevent it from ben-
efitting from coverage for injuries that took place when it
was paying no premiums. . . . Allocation may also be
more efficient because 'any contribution proceeding will
involve many of the same issues that are raised in the
initial liability proceeding, and . . . it is more efficient to
deal with these issues in a single proceeding.' "

*Olin Corp.* v. *Insurance Co. of N. Am.*, 221 F.3d 307, 323 (2d
Cir. 2000), quoting *In re Prudential Lines Inc.*, 158 F.3d 65, 85
(2d Cir. 1998).

In our view, pro rata allocation produces a more equitable
result than joint and several allocation, which "creates a false
equivalence between an insured who has purchased insurance
coverage continuously for many years and an insured who has

purchased only one year of insurance coverage." *Public Serv. Co. of Colo.* v. *Wallis & Cos.*, 986 P.2d 924, 939-940 (Colo. 1999). This false equivalence would tend to "reduce[] the incentive of . . . property owners to insure against future risks." *Owens-Illinois, Inc.* v. *United Ins. Co.*, 138 N.J. 437, 473 (1994). This in turn would "reduce the available assets to manage the risk." *Id.* In sum, the pro rata allocation method promotes judicial efficiency, engenders stability and predictability in the insurance market, provides incentive for responsible commercial behavior, and produces an equitable result.[38]

Having concluded that a pro rata allocation of losses is appropriate in the circumstances of this case, we now consider how that allocation should proceed under Massachusetts law.

---

[38]Boston Gas has directed our attention to *Emhart Indus., Inc.* v. *Century Indem. Co.*, 559 F.3d 57, 70-74 (1st Cir. 2009), where the court recently applied the joint and several or "all sums" method of allocation to defense costs as a matter of Rhode Island law. Significantly, the First Circuit concluded that adopting pro rata allocation would be inconsistent with Rhode Island's "manifestation" theory for the trigger of coverage. *Id.* at 72 n.2, 77, quoting *Emhart Indus, Inc.* v. *Home Ins. Co.*, 515 F. Supp. 2d 228, 256 (D.R.I. 2007) ("[T]o adopt th[e] 'time-on-the-risk' allocation borders on adopting a 'continuous trigger' theory of coverage, in which the existence of [pollutants] 'triggers' coverage every year. . . . '[T]he Rhode Island Supreme Court has adopted a separate, more circumscribed trigger theory.' "). See *id.* at 78, quoting *CPC Int'l, Inc.* v. *Northbrook Excess & Surplus Ins. Co.*, 668 A.2d 647, 649 (R.I. 1995) (" 'occurrence' under a general liability policy takes place when property damage, which includes property loss, manifests itself or is discovered or in the exercise of reasonable diligence, is discoverable"). See also 23 E.M. Holmes, Appleman on Insurance § 145.3[B][2][a], at 14 (2d. ed. 2003) (manifestation trigger assigns date of loss "to the policy period when property damage or actual damage is discovered, becomes known to the insured or a third party, or should have reasonably been discovered"). We have not adopted a trigger theory that is so circumscribed. See *Trustees of Tufts Univ.* v. *Commercial Union Ins. Co.*, 415 Mass. 844, 853-855 (1993) (rejecting manifestation trigger theory in environmental contamination context but declining expressly to adopt another trigger theory). See also 23 E.M. Holmes, *supra* at 15 ("Although a manifestation trigger of coverage provides greater certainty as to the date of loss and avoids allocation among several years of coverage, the trend is to spread risk over the years that injury or damage was taking place rather than in the year of discovery"). Pro rata allocation is thus not inconsistent with any "circumscribed" trigger theory in Massachusetts as it may be in Rhode Island. Finally, the *Emhart* case is distinguishable because it involved allocation of defense costs, while this case involves allocation of indemnity costs. See *Emhart Indus., Inc.* v. *Century Indem. Co.*, *supra* at 70, 72 ("there is *no connection* between limiting coverage by the policy period and the amount of defense costs").

2. *Pro rata allocation method.* The second certified question requires us to determine the appropriate method or formula for allocating damages on a pro rata basis. Determining the proper method for prorating losses raises a myriad of issues, which have caused courts to adopt several different pro rata allocation methods in cases involving long-tail claims. See S.M. Seaman & J.R. Schulze, Allocation of Losses in Complex Insurance Coverage Claims § 4.3[b], at 4-17 — 4-21 (2d ed. 2008). The ideal method is a "fact-based" allocation, under which courts would "determine precisely what injury or damage took place during each contract period or uninsured period and allocate the loss accordingly." *Id.* at 4.3[b][1], at 18. "Although such an allocation is the most consistent with the contract language, the inability to make such determinations or the litigation costs associated with such an exact allocation has caused courts to use various proxies for deriving fair apportionment." *Id.* See, e.g., *Northern States Power Co.* v. *Fidelity & Cas. Co.*, 523 N.W.2d 657, 662-665 (Minn. 1994) (adopting flexible time-on-the-risk approach).

We discuss here the "two primary means of apportioning liability on a pro rata basis" where a fact-based allocation is not feasible. *EnergyNorth Natural Gas, Inc.* v. *Certain Underwriters at Lloyd's*, 156 N.H. 333, 340 (2007). Perhaps the most common method of apportionment is what has come to be known as pro rata allocation by "time on the risk."[39] See S.M. Seaman & J.R. Schulze, *supra* at § 4.3[b][3], at 4-19. Under this allocation method, "each triggered policy bears a share of the total damages [up to its policy limit] proportionate to the number of years it was on the risk [the numerator], relative to the total number of years of triggered coverage [the denominator]." 23 E.M. Holmes, Appleman on Insurance § 145.4[A][2][b], at 24 (2d ed. 2003). "Apportioning costs among all triggered years is compatible with having determined that some injury or damage resulted in all of those years. Consistent with the contract language, an insurer pays its percentage of loss attributed to its policy period." *Id.* at 29. "[T]he time-on-the-risk method offers several policy advantages, including spreading the risk to the

---

[39]The "time on the risk" approach is also sometimes referred to as "proration by years" or "equal shares." See 23 E.M. Holmes, *supra* at § 145.4[A][2][b], at 24-25.

maximum number of carriers, easily identifying each insurer's liability through a relatively simple calculation, and reducing the necessity for subsequent indemnification actions between and among the insurers." *Towns* v. *Northern Sec. Ins. Co.*, 964 A.2d 1150, 1166 (Vt. 2008). However, "[c]ritics of pro-ration by years note that it fails to consider the limits of each policy because a policy with very low limits of liability may be liable for the same amount as a policy with much greater limits, despite the likely disparity in the premium paid by the insured to the carrier(s)." 23 E.M. Holmes, *supra* at § 145.4[A][2][b], at 25 n.109.

The other principal method of apportionment involves prorating losses by years and limits. The Supreme Court of New Jersey adopted this method in *Owens-Illinois, Inc.* v. *United Ins. Co.*, 138 N.J. 437, 474-477 (1994), and it was subsequently adopted by the Supreme Court of New Hampshire, which explained:

> "Under pro-ration by years and limits, loss is allocated among policies 'based on both the number of years a policy is on the risk as well as that policy's limits of liability. The basis of an individual insurer's liability is the aggregate coverage it underwrote during the period in which the loss occurred.' . . . Under this approach, 'an insurer's proportionate share is established by dividing its aggregate policy limits for all the years it was on the risk for the single, continuing occurrence by the aggregate policy limits of all the available policies and then multiplying that percentage by the amount of indemnity costs.' " (Citations omitted.)

*EnergyNorth Natural Gas, Inc.* v. *Certain Underwriters at Lloyd's*, 156 N.H. 333, 341 (2007), quoting 23 E.M. Holmes, *supra* at § 145.4[A][2][c], at 30, and Colon, Pay it Forward: Allocating Defense and Indemnity Costs in Environmental Liability Cases in California, 24 Ins. Litig. Rep. 43, 60 (2002). The rationale for allocating in this manner is "that insurers who provided more coverage, that is, higher limits or lower deductibles, assumed more of the risk of liability than insurers who provided less coverage." Comment, Allocating Progressive Injury Liability Among Successive Insurance Policies, 64 U. Chi. L. Rev. 257, 274-275 (1997). "A major criticism of pro-ration

by years and limits is that insurers with higher limits may be liable for a disproportionate share of damages based solely on their limits." 23 E.M. Holmes, *supra* at § 145.4[A][2][c], at 30 n.133.[40]

Century asks us to adopt the time-on-the-risk method in the absence of evidence more closely approximating the actual distribution of property damage. It argues, however, that we should leave room for lower courts to adopt different practical approaches to proration when the facts permit a more accurate estimation of

[40]The following example, taken from the New Hampshire Supreme Court's opinion in the *EnergyNorth* case, illustrates the difference between pro rata by time on the risk and pro rata by time and limits:

> "Assume that a company, which was found liable for a $15 million verdict for pollution over twenty years, had insurance with four different primary insurers. . . . Company A provided $.5 million insurance for five years; Company B provided $1 million insurance for six years; Company C provided $2 million insurance for four years; and Company D provided $4 million insurance for five years. . . .

> "*Under pro-ration by years,* Company A would be liable for 25% of the verdict, or $3.75 million, because it was on the risk for five out of the twenty years over which the pollution occurred. . . . Company D would also be liable for 25% of the verdict for the same reason. . . . Company B would be liable for 30% of the verdict, or $4.5 million, because it was on the risk for six out of the twenty years, and Company C would be liable for 20% of the verdict, or $3 million, because it was on the risk for four out of the twenty years. . . .

> "*Under pro-ration by years* and limits, Company A would be responsible for 6.85% of the risk. . . . This percentage is derived by dividing its total limit for the five years it was on the risk ($2.5 million) by the total limits of all of the policies during the entire twenty years of pollution ($36.50 million). . . . This percentage is then multiplied by the $15 million verdict to yield $1.0275 million as the total amount of Company A's liability. . . . Company B would be responsible for 16.44% of the risk ($6 million limit divided by $36.50 million) or $2.466 million (16.44% of $15 million). Company C would be responsible for 21.92% of the risk ($8 million limit divided by $36.50 million) or $3.288 million (21.92% of $15 million). . . . Company D would be responsible for 54.80% of the risk ($20 million divided by $36.50 million) or $8.220 million (54.80% of $15 million)." (Emphasis added. Citations omitted.)

*EnergyNorth Natural Gas, Inc.* v. *Certain Underwriters at Lloyd's,* 156 N.H. 333, 341-342 (2007), citing Bass, The Montrose Decision and Long-Tail Environmental Liability: A New Approach to Allocating Risk Among Multiple Third-Party Insurers, 5 Hastings W.-Nw. J. Envtl. L. & Pol'y 209, 221, 222 (1999).

how much property damage took place in each period. In its brief, Boston Gas did not take a position as to which method of pro rata allocation would be most appropriate, but it did suggest at oral argument that some limits should be placed on pro rata allocation, such as, that there should be no allocation for uninsured years or where insurance could not be purchased. Some of the policyholder amici also suggest that it would be inappropriate to allocate to the policyholder for periods when coverage was unavailable. Century, on the other hand, argues against allocating only across periods during which insurance was available.

We are persuaded that the time-on-the-risk method of allocating losses is appropriate where the evidence will not permit a more accurate allocation of losses during each policy period. "[I]ts inherent simplicity promotes predictability, reduces incentives to litigate, and ultimately reduces premium rates." Comment, *supra* at 281. The *Owens-Illinois* method of prorating by years and limits "disproportionately assign[s] liability to generous policies, disproportionately increasing their price, thus making them more difficult to purchase." Comment, *supra* at 276. Moreover, "[p]rogressive injuries by definition do not . . . magically gravitate toward periods with more coverage." *Id.* at 283. Although either method would require us to indulge in a "probable fiction," *Boston Gas Co.* v. *Century Indem. Co.*, 529 F.3d 8, 14 (1st Cir. 2008), we conclude that the more reasonable fiction to adopt is that the progressive injuries took place evenly across all policy periods. Proration by time on the risk reflects this "probable fiction." *Id.* See 1 A.D. Windt, Insurance Claims and Disputes § 6:47, 6-418 — 6-419 (5th ed. 2007) ("the most equitable [method of proration] is allocating based upon the relative periods of time each insurer was on the risk, and the courts have, in general, so recognized").

As indicated above, most courts engaging in pro rata allocation require the policyholder to participate in the allocation to some extent. See S.M. Seaman & J.R. Schulze, Allocation of Losses in Complex Insurance Coverage Claims § 4.3[c], at 4-21 — 4-28 (2d ed. 2008). "[W]here the policyholder is self-insured for any period of time on the risk, many courts have concluded that it is equally fair and reasonable to hold the policyholder responsible for that portion of the total defense and indemnity costs over

which he or she chose to assume the risk." *Towns* v. *Northern Sec. Ins. Co.*, 964 A.2d 1150, 1167 (Vt. 2008), and cases cited. That is, for triggered periods "in which there is either no coverage, insufficient coverage, or coverage that was issued with an applicable exclusion, these courts require the policyholder to bear the financial burden for those periods of no insurance, self-insurance, or insufficient insurance." S.M. Seaman & J.R. Schulze, *supra* at 4-21, and cases cited. Some courts have limited the policyholder's obligation to participate in the allocation to periods during which insurance was commercially "available."[41] These courts have generally held that losses should not be allocated to a policyholder for periods during which the "policyholder was unable to obtain coverage in the market place for a particular risk and with respect to losses resulting from activities or products placed into commerce before such time as coverage became 'unavailable' due to pollution and asbestos exclusions." S.M. Seaman & J.R. Schulze, *supra* at § 4.3[c][1], at 4-27. We decline to adopt such an unavailability exception because to do so would contravene the limitation of coverage in the Century policies to liability attributable to property damage during the policy periods. As Century argues in its brief, the unavailability exception "effectively provides insurance where insurers made the calculated decision not to assume risk and not to accept premiums. In effect,

---

[41]See, e.g., *Stonewall Ins. Co.* v. *Asbestos Claims Mgt. Corp.*, 73 F.3d 1178, 1203-1204 (2d Cir. 1995), modified, 85 F.3d 49, 51 (2d Cir. 1996) (adopting "proration-to-the-insured" for "years in which [the policyholder] elected not to purchase insurance or purchased insufficient insurance," but not for periods after 1985, when asbestos liability insurance became unavailable); *Owens-Illinois, Inc.* v. *United Ins. Co.*, 138 N.J. 437, 479 (1994) ("When periods of no insurance reflect a decision by an actor to assume or retain a risk, as opposed to periods when coverage for a risk is not available, to expect the risk-bearer to share in the allocation is reasonable"). But see, e.g., *Sybron Transition Corp.* v. *Security Ins.*, 258 F.3d 595, 599-600 (7th Cir. 2001) (rejecting *Stonewall*'s distinction between periods when insurance was "available" or "unavailable" because "[t]he whole idea of a time-on-the-risk calculation is that any given insurer's share reflects the ratio of its coverage [and thus the premiums it collected] to the total risk"); *AAA Disposal Sys., Inc.* v. *Aetna Cas. & Sur. Co.*, 355 Ill. App. 3d 275, 287 (2005) ("Because the policy periods contained in the . . . insurance policies do not include the years plaintiffs went uninsured, we fail to understand why [the insurer] should have to bear the costs from that period. . . . We understand that insurance coverage was not available for the period at issue, but intervenors cannot shift responsibility for the uninsured years to [the insurer]").

because the policyholder could not buy insurance, it is treated as though it did by passing those uninsurable losses to insured periods." This would not be equitable to insurers if the insured purchased coverage for only a few years where there was protracted damage.

Finally, we conclude that Boston Gas must satisfy only a pro-rated amount of its per occurrence self-insured retention for each triggered policy period, to be prorated on the same basis as Century's liability. Thus, if the pollution in this case had occurred over the course of a decade, then one-tenth of the total cleanup cost would be apportioned to each policy year and Boston Gas would be responsible for one-tenth of its applicable self-insured retention for each year. We reach this conclusion because it produces an equitable result in the face of policy language that "is at best ambiguous as to what happens when the insurer is held liable for only part of a continuous occurrence." *Lafarge Corp.* v. *Hartford Cas. Ins. Co.*, 61 F.3d 389, 401 (5th Cir. 1995) (upholding District Court's apportionment of deductible on same basis as insurer's liability for defense costs). See *Allmerica Fin. Corp.* v. *Certain Underwriters at Lloyd's, London*, 449 Mass. 621, 628 (2007) ("Any ambiguities in the language of an insurance contract are interpreted against the insurer who used them and in favor of the insured"). Therefore, unless the policy language unambiguously provides otherwise, the policyholder's self-insured retention should be prorated on the same basis as the insurer's liability in the case of continuous environmental contamination.

In sum, where it is not feasible to make a fact-based allocation of losses attributable to each policy period, losses should be allocated using the time-on-the-risk method we have described. To prorate using that method:

> "[T]he total amount of damages should be divided by the total number of years to yield the amount of damage that is fairly attributable to each year. For example, if an insured's liability for a decade of pollution is one million dollars, then one tenth of the total liability, or $100,000, is fairly attributable to each policy-year."

*Public Serv. Co. of Colo.* v. *Wallis & Cos.*, 986 P.2d 924, 941 (Colo. 1999). The policyholder is responsible for any periods that

it went without insurance. Finally, unless the policy language unambiguously provides otherwise, the policyholder is liable for only a prorated portion of its per occurrence self-insured retention for each triggered policy period, to be prorated on the same basis as the insurer's liability.

Ultimately, the pro rata allocation method that we espouse here addresses a problem of proof. We do not foreclose the possibility that in some cases the facts may permit a more accurate estimation of how much property damage took place in each period. If the evidence permits an accurate estimation of the quantum of property damage in each policy period then proration by time on the risk may be inappropriate. Given the factual complexities of cases of this sort, we defer to trial judges in the first instance to determine whether losses can be allocated based on the amount of property damage that in fact occurred during each policy period, or must instead be allocated on the basis of each insurer's time on the risk.

Our answers to the first two certified questions obviate the need to answer the third certified question.

The Reporter of Decisions is to furnish attested copies of this opinion to the clerk of this court. The clerk in turn will transmit one copy, under the seal of this court, to the clerk of the United States Court of Appeals for the First Circuit, as the answers to the questions certified, and will also transmit a copy to each party.