Sanders, Janet L., J.
Plaintiff Massachusetts Insurers Insolvency Fund (the Fund) and defendant Medical Liability Mutual Insurance Company (MLMIC) a/k/a Healthcare Underwriters Mutual Insurance Company (HUM) are successors to separate professional liability policies issued to Dr. Robert Browne, M.D. (Dr. Browne). The Fund initiated this action seeking a determination of its indemnity obligations to Dr. Browne in connection with a medical malpractice lawsuit filed against him by the Estate of Maria Vieira (the Estate). Because ajuiy rendered a verdict against Dr. Browne, the Fund and MLMIC now move for summary judgment seeking declarations regarding: (1) whether the Fund is responsible for any portion of the judgment against Dr. Browne; and (2) to the extent that it is, whether the Fund’s liability for the Estate’s claim for the benefit of Ms. Vieira’s husband is limited to $299,999 under G.L.c. 175D, §5(l)(a). For the reasons that follow, this Court concludes that the judgment, including prejudgment interest, must be apportioned between the Fund and MLMIC on a pro rata “time on the risk” basis and that the Fund is not required to pay more than $299,999, including prejudgment interest, in connection with the damages owed to Ms. Vieira’s husband.
BACKGROUND[1]
From August 3, 2001 to August 1, 2002, Dr. Browne was an insured under a professional liability policy issued by Lawrenceville Property and Casualty Company (Lawrenceville); at some point, the MIIX Insurance Company assumed the obligations under that policy (referenced herein as the “MIIX Policy”). The MIIX Policy provides that the insurer “will pay ... all sums that the insured shall become legally obligated to pay as damages because of. . . [i]njuiy arising out of the rendering of or failing to render, on or after the retroactive date, professional services by any individual insured, or by any person for whose acts or omissions such insured is legally responsible . . .” MIIX Policy at I. This includes accrued prejudgment interest for each medical incident “limited to the amount applicable to the damages paid by the Company.” MIIX Policy at VIII(e). The policy further provides that “(u]pon termination of this policy, the Company will pay on behalf of the insured all sums that the insured shall become legally obligated to pay as damages because of injury to which this insurance applies and that arise out of medical incidents taking place after the retroactive date and prior to the termination date of the policy, but for which injury a claim is first made after such termination.” MIIX Policy at II. “Medical incident” means “all acts or omissions in the rendering of or failure to render professional services from which a claim arises or claims arise . . .” Id. at VII.
From July 31, 2002 to December 31, 2004, Dr. Browne was insured under three professional liability-policies issued by HUM (the HUM Policies) covering a period from December 31, 2001 to December 31, 2004.[2] As a result of a merger, MLMIC assumed responsibility for these policies. The HUM Policies provide that MLMIC “will pay ‘claims’ which the ‘insured’ becomes legally obligated to pay because of ‘professional services’ provided or which should have *104 been provided.” HUM Policies, at Section I.A. The policies further provide that claims will be paid only if “the ‘claim’ involves an allegation of injuiy or death to a person because of‘professional services’ provided or which should have been provided” and “the ‘insured’ provided or should have provided those ‘professional services’ during the policy period in the ‘coverage territory.’ ” Id. (italics added). “Claim” means “an allegation of injury or death to a person or damage to property to which this insurance applies” or “a civil proceeding in which damages are alleged.” Payment for a claim includes accrued pre-judgment interest “on any part of the judgment we pay.” Id. at II.D.
In 2005, Maria Vieira brought a medical malpractice action against Dr. Browne and others, alleging that they had provided her with negligent care and treatment of her colon cancer. Ms. Vieira died of her cancer in 2006 and her Estate was substituted as plaintiff. The Estate subsequently brought claims against the defendants pursuant to the Wrongful Death Statute for Ms. Vieira’s conscious pain and suffering and for the benefit of her husband Joseph and their two sons, Paul and Jeffeiy.
As the litigation progressed, a court declared MIIX insolvent and ordered that it be liquidated. As a result, the Fund, an entity created by the Legislature to provide to the public some protection from insurer insolvency, became obligated to pay covered claims under MUX’s policies, including the 2001-2002 policy issued to Dr. Browne. Thereafter, a dispute arose between the Fund and MLMIC as to their respective obligations to defend and indemnify Dr. Browne and other defendants in the medical malpractice action.[3] This lawsuit followed.
On April 8, 2009, the Fund moved for summary judgment on all three counts of its Complaint for Declaratory Relief. In response, MLMIC moved to stay a decision on Counts I and III on the grounds that the declarations sought were premature. By a written decision dated September 17, 2009, this Court (Fabricant, J.) granted the Fund’s motion with respect to Count II and allowed MLMIC’s motion to stay Counts I and III pending resolution of the medical malpractice action [26 Mass. L. Rptr. 181].
On May 10, 2013, a jury returned a verdict against Dr. Browne totaling $1,230,000. Of that award, $500,000 was for Ms. Vieira’s husband, and $250,000 was awarded to each of their two sons. In rendering its verdict, the juiy considered a supplemental special question in which it was asked to identify the dates on which Dr. Browne’s negligence was a substantial contributing factor in causing injuiy to and the death of Ms. Vieira. The jury responded: “8/3/01-2/13/04,” a date range encompassing both the MIIX and HUM policy periods. Judgment was thereafter entered against Dr. Browne in the amount of $2,444,374.46, inclusive of prejudgment interest. That judgment was paid in full pursuant to an agreement between the parties in the instant action, with a reservation of rights relating to the issues now before the Court.
DISCUSSION
Although G.L.c. 175D does not preclude recovery from the Fund where other solvent insurers exist, the Fund’s liability is not coextensive with the obligations of those solvent insurers. See AW Chesterton Co. v. Massachusetts Insurers Insolvency Fund, 445 Mass. 502, 524 (2005). The Fund is intended to be a source of last resort, only serving claimants of insolvent insurers who have no other source of recoveiy beyond the Fund. Id. To that end, the Fund’s obligations are limited to “covered claims,” defined as unpaid claims made pursuant to a policy issued by an insolvent insurer. G.L.c. 175D, §1(2). Claims are not “unpaid” if compensation remains available from another source, such as another insurance policy whose limits have not yet been exhausted. See AW Chesterton Co., 445 Mass. at. 524.
In moving for summary judgment on Count I, the Fund argues that there is no “covered claim” under the MIIX Policy because, pursuant to the terms of the HUM Policies, MLMIC is responsible for the entire judgment against Dr. Browne. In response, MLMIC contends that, pursuant to Boston Gas Co. v. Century Indem. Co., 454 Mass. 337 (2009), and the plain language of its policies, it is required to pay only its pro rata share of the liability based on its time on the risk. After carefully reviewing the HUM Policies, this Court is persuaded that Boston Gas is controlling and that MLMIC is correct.
Where, as here, successive policies are triggered by claims for occurrences or injuries that take place over a period of years, courts have developed two approaches for allocating damages among the different policies. The first approach, typically favored by insureds, is known as the “all sums” method of allocation. Under this method, any insurer where the policy is “on the risk” for any portion of the period in which the insured sustained property damage or bodily injuiy is jointly and severally liable for the entire loss, up to its policy limits, including loss attributable to damage that did not occur during the policy period. The burden is thus placed on the insurer to institute a second lawsuit seeking contribution from other insurers. The second approach, which is usually favored by insurers, is referred to as the “pro rata” allocation method. This method requires that the allocation of loss to a particular policy be proportionate to the damage suffered during that policy’s term. A key feature of the pro rata approach is that it generally requires the insured to participate in the allocation for those periods where it had no insurance, self-insurance, or insufficient insurance.
Courts in different states have split as to which approach to follow. For several years, the trend in Massachusetts appeared to favor the “all sums” *105 method. That changed when the SJC decided Boston Gas, supra.
That case began in federal court when plaintiff Boston Gas Company sued one of its insurers, Century Indemnity Company, for environmental remediation costs incurred as a result of contamination at one of the plaintiffs work sites. After a jury found Century liable, there remained the question of whether other insurers whose policies had also been triggered by the environmental contamination should pay their pro rata share or whether Century was jointly and severally liable for the entire amount, collecting from other insurers on its own through contribution claims. The federal court concluded that Boston Gas could collect the entire amount of the award against Century on an “ ‘all sums,’ joint and several allocation method.” On appeal, the First Circuit certified the allocation question to the SJC, which responded by holding that Massachusetts law required that Boston Gas’s damages should be apportioned among the different policies on a pro rata basis.
In reaching that decision, the SJC looked first to the plain language of the insurance policies before it. It noted that the policies’ “Policy Period, Territory” provisions limited coverage to properly damage or occurrences that took place “during the policy period” and that the policies defined an “occurrence” to be limited to exposure to conditions causing property damage “during the policy period.” The SJC noted that in so-called “long-tail claims” where injuries occur over a number of years, it is particularly difficult to attribute loss to a single clear event. In such situations of ongoing and continuous injuries, the SJC reasoned that no reasonable policyholder could expect that a single one-year policy would cover loss caused by the release of toxic industrial wastes taking place over decades. 454 Mass, at 363. A pro rata approach was thus more in keeping with the parties’ reasonable expectations. 454 Mass. at 358.
The SJC also reasoned that pro rata allocation serves important public policy objectives. By eliminating the need for a second round of contribution actions among insurers, the approach decreases litigation costs. It also introduces more certainty and predictability as to outcomes, and is generally more equitable. Particularly where one insurer is unable to pay its share, then there is “logic in having the risk of such defalcation fall on the insured, which purchased the defaulting insurer’s policy, rather than on another insurer which was a stranger to the selection process. ” Id. at 365. Moreover, where there is no factual basis for determining how much of an ongoing injuiy occurred during any given policy period, it makes particular sense to apply a simple formula whereby an insurer pays its percentage of loss based on the number of years it was “on the risk.” Id. at 370.
The same result is compelled in the instant case. The jury in the medical malpractice action determined that the negligence that caused the injuiy and death of Maria Viera occurred over a range of time. Thus, as in Boston Gas, it is not possible to make a fact-based allocation among different policies since the professional services (or failure to provide services) which gave rise to the claim of negligence spanned a number of years. On the other hand, it is equally clear, based on the plain language of the HUM Policies, that MLMIC is responsible only for claims arising out of Dr. Browne’s professional services where he provided or should have provided those services “during the policy period.” In other words, if the services were rendered or should have been rendered outside of the policy period and that was the cause of injury or damage, then MLMIC is not liable. In light of this policy language coupled with the difficulty of making a fact-based allocation, the pro rata approach endorsed by Boston Gas, supra, should be applied here. Pursuant to that approach, the Fund is responsible for the period from August 3, 2001 through August 1, 2002, and MLMIC is responsible for the period from July 31, 2002 through February 13, 2004.
The Fund argues that the pro rata approach adopted in Boston Gas is inapplicable because, unlike the policies before the SJC, the phrase “during the policy period” in the HUM policies requires only that some of the professional services giving rise to a claim must take place in the policy period: once the policy is triggered (it is argued), the insurer becomes liable for all injuries resulting therefrom. The Fund also notes that, in contrast to the policies in Boston Gas, there is no similar “Policy Period, Territory” provision in the HUM Policies. This Court is not convinced, however, that these differences in the policy language mandate a different result.
Indeed, the Appeals Court recently shrugged off similar arguments in New England Insulation Co., Inc. v. Liberty Mut Ins. Co., See 83 Mass.App.Ct. 631 (2013), a case involving insurance coverage for asbestos-related injuries. There, the insured argued that joint and several allocation was required because the policy covered damage for “bodily injuiy,” which was in turn defined to encompass not only injuiy that occurred during the policy period, but also “death at any time resulting therefrom.” In rejecting this argument, the Appeals Court concluded that this language simply sets forth the “unremarkable proposition, recognized in Boston Gas, that in the typical case, where time of injuiy is easily determined, the policy in place when the injuiy occurs will cover all consequential damages, even those taking place after the policy period.” 83 Mass.App.Ct. at 637. In contrast, where the injuiy develops over time, “it is not readily apparent how to allocate loss to a particular policy” and indeed may prove, as one commentator noted, “scientifically and administratively impossible.” 83 Mass.App.Ct. at 638, quoting Comment, “Allocating Progressive Injuiy Among Successive Insurance Poli *106 cies,” 64 U.Chi.L.Rev. 257, 258 (1997). The Appeals Court concluded that in asbestos cases no less than in environmental contamination cases, the pro rata approach serves the goal of judicial efficiency, promotes predictability in the insurance market, and produces a more equitable result. Although the instant case is not one of environmental contamination or asbestos exposure, the same holds true here, since the fact finder has already concluded that the acts and omissions that resulted in the death of Ms. Vieira cannot be pinpointed in time and range over a period of years.
The Fund further attempts to distinguish Boston Gas by arguing that the HUM Policies contain language suggesting an intent to provide coverage for injuries that occur outside the policy period. Specifically, the Fund points to the policies’ Limits of Coverage Section which provides that, where a claim involves the continuous treatment of the same illness or condition, the claim will be considered a “single claim” for purposes of determining the limits of liability even though the professional services were provided over several policy periods. HUM Policies at Section IV.C. Faced with a similarly worded provision in Boston Gas, however, the SJC concluded that this language did not support a joint and several allocation of liability. Rather, the SJC held that the clause (which there spoke in terms of “occurrences” instead of “claims”) was relevant only in determining the limits of the insurer’s liability and did not provide support for the proposition that the insurer was liable for damages occurring outside the policy period. Similarly, the provision cited by the Fund is important only in determining MLMIC’s limits of liability. It does not support the extension of coverage for professional negligence occurring before or after the policy’s term.
Because the Fund is obligated to a pay a portion of the judgment against Dr. Browne, the Court must address Count III of the Complaint. In that count, the Fund seeks a declaration that, to the extent the Fund is obligated to indemnify Dr. Browne, the Fund’s liability for the Estate’s claim for the benefit of Mr. Vieira, inclusive of prejudgment interest, is limited to $299,999. General Laws c. 175D, §5(l)(a) expressly restricts the Fund’s obligation on a non-worker’s compensation claim to an amount less than $300,000. MLMIC has not put forth any argument indicating why Section 5(l)(a) should not apply. Accordingly, the Court concludes that the Fund’s liability for the claim connected to Mr. Vieira is limited to $299,999.
CONCLUSION AND ORDER
For the foregoing reasons, MLMIC’s Motion for Summary is ALLOWED as to Count I and the Fund’s Motion as to that Count is DENIED. As to Count III, the Fund’s Motion is ALLOWED and MLMIC’s Motion is DENIED. Specifically, it is DECLARED that MLMIC is required only to pay its pro rata share of the judgment entered against Dr. Browne, as calculated under the formula set forth in Boston Gas v. Century Indemnity Co., 454 Mass. 337 (2009). It is further DECLARED that the Fund’s liability for damages in connection with the award to Mr. Vieira is limited to $299,999, per G.L.c. 175D. The parties shall submit a proposed form of judgment in line with this opinion on or before February 15, 2014.

In addition to facts set forth the parties’ Statement of Undisputed Facts, this Court has taken judicial notice of information contained in the docket of the underlying Superior Court medical malpractice action.

Dr. Browne was added as an insured to the first HUM Policy effective July 31, 2002.

Because only Dr. Browne was found liable in the medical malpractice action, the issue of coverage as to the other defendants is no longer an issue.